IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLOW CREEK FUELS, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 08-5417 |
| | : | |
| v. | : | |
| | : | |
| FARM & HOME OIL CO., et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

Jones, J.                                                                                          September 18, 2009

Before the Court is a Motion to Dismiss filed by Defendants Buckeye Energy Services LLC, Buckeye Energy Holdings LLC, and Farm & Home Oil Co. (Doc. No. 11), Plaintiff Willow Creek Fuels, Inc.'s Response in Opposition thereto (Doc. No. 12), and Defendants' Reply (Doc. No. 15).  For the following reasons, Defendants' Motion will be granted as to Willow Creek's federal antitrust claims (Counts I and II) and the Court will decline to exercise supplemental jurisdiction over Willow Creek's state law claims (Counts III, IV, and V).

**I.     Procedural History**

On November 17, 2008, Willow Creek Fuels, Inc. ("Willow Creek") and Scott W. Adams, Sr., the Secretary and Chief Operating Officer of Willow Creek, filed their original Complaint against Buckeye Partners, LP and Farm & Home Oil Co. ("F&H").  On February 10, 2009, Willow Creek, as the sole Plaintiff, filed an Amended Complaint.  The Amended Complaint named three defendants: Buckeye Energy Services, LLC ("BES"), F&H, and Buckeye Energy Holdings, LLC ("BEH").  On February 20, 2009, all three Defendants filed a Motion to

Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(B)(6). On March 9, 2009, Willow Creek filed a Response in opposition to the Motion to Dismiss. On April 6, 2009, Defendants filed a Reply. On May 27, 2009, Defendants filed a Notice of Supplemental Authority. This Court heard oral argument on September 14, 2009.

## II.     Factual Allegations

The Court recites the facts as alleged in the Complaint and as viewed in the light most favorable to Plaintiff.

Willow Creek Fuels, Inc. ("Willow Creek") is in the business of supplying petroleum products, including fuel oil, diesel fuel, gasoline, kerosene and propane. (Am. Compl. ¶ 8.) Willow Creek supplies its products to homes, businesses, school districts, and other governmental entities in central and southeastern Pennsylvania. (Am. Compl. ¶¶ 8, 42.)

Between December 2006 and May 2007, Willow Creek entered into a series of Petroleum Sales Agreements ("PSAs") with F&H whereby Willow Creek would buy specified quantities of oil and gasoline products from F&H, with payments and deliveries to occur monthly. (Am. Compl. ¶¶ 19, 33-38; Am. Compl., Ex. B, Petroleum Sales Agreements between Willow Creek and F&H, Various Dates in 2006 ("2006 PSAs").) In reliance on the PSAs, Willow Creek entered into fuel sales contracts with various businesses and government entities. (Am. Compl. ¶ 42.)

Through its representations, F&H induced Willow Creek to secure two lines of credit totaling $1,125,000 in order to continue satisfying its obligations to F&H pursuant to the PSAs. (Am. Compl. ¶¶ 39, 51.) Willow Creek satisfied all its obligations under the PSAs, including making sixty (60) payments to F&H between November 2006 and October 2007. (Am. Compl.

¶¶ 40, 50.) As a result of the $1,125,000.00 credit procured by Willow Creek for the benefit of F&H, the remaining balance under the Sales Contract was $395,708.47 as of December 1, 2007. (Am. Compl. ¶ 41.) Willow Creek procured the majority of the money owed under the PSAs and transferred said money to F&H. (Am. Compl. ¶ 72.)

On November 14, 2007, F&H wrote to Willow Creek and stated that it was terminating five of the PSAs due to Willow Creek's failure to make payments for previously received deliveries of oil and gasoline products. (Am. Compl. ¶¶ 43-44; Letter from Richard A. Longacre to Willow Creek, Nov. 14, 2007 ("Longacre Letter").)[1]  F&H stated in the Letter that, as of November 14, 2007, Willow Creek owed F&H $1,520,708.47 in unpaid invoices for sales of oil and gasoline, hauling charges, and late payment charges (collectively, "Outstanding Obligations"). (Am. Compl. ¶ 44; Longacre Letter.) In the Letter, F&H also stated that it intended to mitigate any damages due to Willow Creek's breach of contract by selling the oil and gasoline on the open market and applying the proceeds toward Willow Creek's Outstanding Obligations. (Am. Compl. ¶¶ 46-47; Longacre Letter.) F&H sold the oil and gasoline products on hand or sold future PSAs for a substantial profit over what it would have received from Willow Creek per the terminated PSAs. (Am. Compl. ¶ 48.)

When F&H did not deliver the oil and gasoline products referenced in the Letter, Willow Creek was unable to fulfill the terms of the sales contracts it had made with its customers. (Am. Compl. ¶ 49.) As a result of F&H's actions, Willow Creek sustained direct lost profit in the amount of $1,245,945.31 and was forced to file Chapter 11 bankruptcy on February 19, 2008.

---

[1] The specific PSAs that were terminated on November 14, 2007, are Ref. Nos. 052208 (87 Conventional Gasoline), 121306 (Heating Oil), 032807 (Heating Oil), 052407 (Ultra Low Sulfur Diesel), and 032807 (Ultra Low Sulfur Diesel). (Longacre Letter.)

(Am. Compl. ¶¶ 53-54.)  In addition, Willow Creek's former customers were left empty-handed, and some of those former customers were forced to contract elsewhere at market prices far higher than they would have had to pay pursuant to their sales contracts with Willow Creek.  (Am. Compl. ¶ 49.)

In December 2007, BEH entered into an agreement to acquire F&H, and on January 10, 2008, BEH acquired all equity interests in F&H for cash consideration of approximately $145.5 million. (Am. Compl. ¶¶ 5-7.)  BES is a wholly owned subsidiary of BEH and a subsidiary of Buckeye, a national distributor of petroleum products.  (Am. Compl. ¶¶ 7, 25, 57(d).)  Since the merger, Defendants have collectively maintained one of the largest petroleum products pipeline systems in the United States and have owned and operated fifty refined petroleum products terminals.  (Am. Compl. ¶ 17.)  By way of the merger, and having eliminated Plaintiff from the market, Defendants willfully acquired monopoly power in the relevant market with the specific intent of successfully excluding competition.  (Am. Compl. ¶¶ 25-26, 57(d).)

Defendants later placed bids with Willow Creek's former customers.  (Am. Compl. ¶ 26.)  In some instances, Defendants ultimately contracted with Willow Creek's former customers.  (Am. Compl. ¶ 26.)  In other instances, Willow Creek's former customers were forced to purchase petroleum products from other suppliers at prices significantly higher than those previously charged by Willow Creek.  (Am. Compl. ¶ 27.)  In the latter instances, Willow Creek believes these petroleum products were actually sold by Defendants.  (Am. Compl. ¶ 27.)

Willow Creek brings claims under the Sherman Act, 15 U.S.C. §§ 1 & 2, and the Clayton

Act, 15 U.S.C. § 1, as well as contract and tort claims under Pennsylvania law.[2]

**III.    Standard of Review**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation and citation omitted).  After the Supreme Court's decision in Bell Atl. Corp. v. Twombly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, — U.S. —, 129 S.Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556).  This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id.  In Ashcroft v. Iqbal, the Supreme Court clarified that this standard applies to all civil cases. Iqbal, 129 S.Ct. at 1949.

**IV.    Discussion**

    **A.    Antitrust Standing**

Defendants argue that Willow Creek lacks standing to pursue its antitrust claims under the Sherman Act and the Clayton Act.  The Court addresses this argument first. See Woodley Rd. Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 736 (3d Cir. 2004).

---

[2] The Amended Complaint is organized into five counts: (I) Wrongful Termination of Distributorship; (II) Exclusive Dealing Arrangements; (III) Breach of Contract; (IV) Detrimental Reliance; and (V) Tortious Interference with Contractual Relations.

"Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983).  In addition to injury to itself, an antitrust plaintiff must show antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993).  "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." Brunswick Corp., 429 U.S. at 489 (internal quotation and citation omitted).

Willow Creek clearly alleges harm to itself, as Defendants concede.  The Court finds that Willow Creek also alleges antitrust injury.  Willow Creek alleges that businesses and municipalities in the central Pennsylvania and Mid-Atlantic market area have been harmed by suppressed competition resulting from Defendants' acts that forced Willow Creek out of the business and residential petroleum product sales market.  (See, e.g., Am. Compl. § 62.)  This is the type of harm that Sherman Act and Clayton Act violations would be likely to cause. Defendants' argument that the alleged harm to competition flows from the termination of the PSAs rather than the antitrust violation does not change the Court's finding that Willow Creek has alleged at least minimal antitrust injury sufficient to support antitrust standing.  However, because Willow Creek has failed to state antitrust claims upon which relief can be granted, the

antitrust claims will be dismissed.

## B. Sherman Act Section 1 Claims

Under Section 1 of the Sherman Act ("Section 1"), "Every contract . . . or conspiracy . . . in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "The essence of a Section 1 claim is the existence of an agreement." Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005). "Because § 1 of the Sherman Act by its terms requires concerted action, 'unilateral activity, no matter what its motivation, cannot give rise to a § 1 violation.' " Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 219 (3d Cir. 2008) (quoting Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998)).

In Bell Atl. Corp. v. Twombly, the Supreme Court explained in detail what a plaintiff must plead in order to state a claim under Section 1:

> [S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. 544, 556-57 (2007).

Here, Willow Creek's Amended Complaint falls short of the pleading standard articulated

in Twombly.  The factual basis for Willow Creeks' conspiracy and exclusive dealing claims is Defendants' alleged termination of the PSAs.  Although Willow Creek refers to the Defendants collectively in the Amended Complaint and alleges that all Defendants terminated the PSAs, that clearly was not the case.  The PSAs show that Willow Creek contracted only with F&H and the termination letter is from F&H only.  (2006 PSAs; Longacre Letter.)  Willow Creek alleges that BEH entered into an agreement to acquire F&H in December 2007 – *after* F&H terminated the PSAs.  Willow Creek does not even allege parallel conduct by F&H and any other defendant.  See Twombly, 550 U.S. at 557.  Plaintiff's allegations that F&H and BEH merged soon after the PSAs were terminated are insufficient to support a Section 1 claim, even when combined with the alleged anticompetitive effects of the Defendants' actions.  Willow Creek does not allege facts to support any relationship or communications between F&H and any other defendant during or prior to the November 14, 2007, termination of the PSAs.  There certainly are no factual allegations to suggest that F&H and any other defendant made an agreement to terminate the PSAs in order to force F&H out of the relevant market or engage in exclusive dealing.  See Twombly, 550 U.S. at 556.  To support a Section 1 claim, Willow Creek would need to allege facts that plausibly suggest an agreement in violation of trade.  Twombly, 550 U.S. at 557.  Such allegations are notably absent from the Amended Complaint in this case.  Therefore, Willow Creek has failed to state a Section 1 claim for conspiracy or exclusive dealing.

  **C.**  **Clayton Act Section 3 Claim**

  Willow Creek alleges that Defendants terminated the PSAs and merged for the purpose of injuring Willow Creek and depriving it of an opportunity to maintain and expand its market.  (Am. Compl. ¶ 66.)  Willow Creek claims that Defendants' actions lessened competition and

created a monopoly in violation of Section 3 of the Clayton Act ("Section 3"), which provides as follows:

> It shall be unlawful for any person . . . to lease or make a sale or contract for sale of goods . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

Exclusive dealing agreements require a purchaser not to deal in the goods of a competitor of the seller. Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 474 n.2 (3d Cir. 1992). To violate Section 3, an arrangement need not contain an express provision of exclusivity. Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 326 (1961). If the practical effect of the arrangement prevents the use of a competitor's goods, it is an exclusive-dealing arrangement. Id. at 326-27. Even if a court finds an exclusive-dealing arrangement, Section 3 is not violated unless a court finds the arrangement forecloses a substantial share of the relevant market. Id. at 327; Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir. 1992). In addition, exclusive dealing does not violate Section 3 if there are legitimate business justifications for the arrangement. Tampa Electric, 365 U.S. at 334-35; Barr Labs., 978 F.2d at 111.

Willow Creek has not alleged sufficient facts to support an exclusive dealing claim under Section 3. Willow Creek alleges that Defendants' termination of the PSAs and Defendants' merger violated Section 3. (Am. Compl. §§ 66, 68.) However, the termination and the merger

cannot violate Section 3 because those actions were not contracts for the sale of goods. A contract for the sale of goods is a threshold requirement of a Section 3 violation according to the plain language of the statute. 15 U.S.C. § 14. Therefore, even if the termination and the merger caused Willow Creek's former customers to stop contracting with Willow Creek, this series of events does not support a Section 3 violation.

        D.        **Sherman Act Section 2 Claim**

Under Section 2 of the Sherman Act ("Section 2"), it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations. . ." 15 U.S.C. § 2. "Liability under Section 2 requires (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 306-07 (3d Cir. 2007); United States v. Grinnell Corp., 384 U.S. 563, 570-571 (1966). See also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 129 S.Ct. 1109, 1118 (2009).

Monopoly power is the ability to control prices and exclude competition in the relevant market. Broadcom Corp., 501 F.3d at 307. Monopoly power may be proven through direct evidence of supracompetitive prices and restricted output or it may be inferred from the structure and composition of the relevant market. Id. "Proving the existence of monopoly power through indirect evidence requires a definition of the relevant market. The scope of the market is a question of fact as to which the plaintiff bears the burden of proof." Id.; Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997). Failure to define the relevant market

in terms of interchangeability of products or cross-elasticity of demand may result in dismissal of a Section 2 claim.  Broadcom Corp., 501 F.3d at 307; Queen City Pizza, 124 F.3d at 436.

The Court finds that Willow Creek has failed to allege the percentage of the relevant market controlled by Defendants.  Willow Creek also has failed to plead any facts regarding the presence or strength of competitors in the market or the elasticity of consumer demand.  Furthermore, Willow Creek has failed to clearly define the relevant market in terms of product type or geography.  In its Amended Complaint, Willow Creek alternately refers to the Parties' businesses as supplying, *inter alia*, "petroleum products," "oil and gasoline," and "liquid fuels and propane."  (See Am. Compl. ¶¶ 8-18.)  Likewise, Willow Creek alternately refers to the geographic market as "central and southeastern Pennsylvania," the greater Delaware Valley region," "Berks County, Pennsylvania," and the mid-Atlantic region.   (See Am. Compl. ¶¶ 8-18.)  In its Opposition to the Motion to Dismiss, Willow Creek argues that the relevant product market is petroleum products.  It also argues that it has defined the relevant geographic market.  On the latter point, the Court strongly disagrees.[3]  However, even if Willow Creek had properly defined the relevant market, the other requirements of a well-pleaded Section 2 claim remain absent.

### E. State Law Claims

Having determined that Willow Creek has failed to state a claim upon which relief can be granted, the Court will dismiss the federal antitrust claims.  There is no diversity of citizenship in this case, and the Court declines to exercise supplemental jurisdiction over Willow Creek's state

---

[3] The Court is unconvinced by Willow Creek's assertion that "central and southeastern Pennsylvania, Berks County, the Delaware Valley and Mid-Atlantic Regions refer almost entirely to the same territory."  (Pl.'s Opp'n at 8.)

law claims for breach of contract, detrimental reliance, and tortious interference in contractual relations.

## V.     Conclusion

For the reasons stated above, Defendants' Motion to dismiss will be granted and Counts I and II of the Amended Complaint will be dismissed.  The Court will decline to exercise supplemental jurisdiction over Counts III, IV, and V of the Amended Complaint.  An appropriate Order follows.